## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

PHILLIP JERGENSON,

       Plaintiff,

v.

THE PARTNERSHIPS AND
UNINCORPORATED ASSOCIATIONS
IDENTIFIED IN SCHEDULE "A",

       Defendants.

**Case No. 1:22-CV-02040**

**Hon. Judge Manish S. Shah**

**JURY TRIAL DEMANDED**

## DEFENDANT'S MOTION FOR ATTORNEYS' FEES

# TABLE OF CONTENTS

I.    FACTUAL BACKGROUND ..................................................................... 3

II.    PROCEDURAL HISTORY .................................................................... 4

III.    LEGAL STANDARD .......................................................................... 5

IV.    THIS CASE IS EXCEPTIONAL BECAUSE PLAINTIFF'S LITIGATING
POSITION WAS WEAK AND OBJECTIVELY UNREASONABLE .................. 5

    A.  Defendant Never Used Plaintiff's Trademark in the United States ...................... 5

    B.  Plaintiff Does Not Own The Trademark ............................................. 7

        1)  *Plaintiff abandoned his trademark in 1987* ..................................... 7

        2)  *Plaintiff never legally regained rights to the Trademark after 1987* ............... 8

    C.  The Registration Is Invalid Due to Plaintiff's Fraud on the USPTO ................. 10

V.    THIS CASE IS EXCEPTIONAL BECAUSE OF THE UNREASONABLE
MANNER IN WHICH THE CASE WAS LITIGATED BY PLAINTIFF ........... 12

    D.  Plaintiff Litigated This Case Knowing That Damages Were Low, But Then
Dismissed This Case Because Damages Were Low .......................................... 12

    E.  Plaintiff Litigated This Case To Wrongly Attain Defendant's Worldwide Sales
Data ........................................................................................ 14

VI.    THE ATTORNEYS' FEES REQUESTED ARE REASONABLE ....................... 15

VII.    CONCLUSION ................................................................................. 16

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

NOW COMES Defendant Inhale International Limited ("Defendant"), an entity registered and existing under the laws of Hong Kong, by and through its undersigned counsel, and files this Motion for Attorneys' Fees. Concurrent with this Motion, Defendant submits the declaration of Louis F. Teran ("Teran Decl.") and the Joint Statement pursuant Local Rule 54.3(e).

## I.      <u>FACTUAL BACKGROUND</u>

This lawsuit was filed by Plaintiff Phillip Jergenson ("Plaintiff"), an individual residing in California. Plaintiff filed this lawsuit against "individuals and entities who reside in the People's Republic of China or other foreign jurisdictions". See *Amended Complaint,* ¶12. One of those entities that Plaintiff targeted with this lawsuit is Defendant Inhale International Limited ("Defendant"), an entity registered and existing under the laws of Hong Kong where it has its principal place of business. Plaintiff's primary claim in this lawsuit is counterfeiting/trademark infringement of the "PROTO PIPE" mark ("Trademark") registered with the United States Patent and Trademark Office ("USPTO").

Plaintiff's trademark registration ("Registration"), was issued based on his false representation that he used the mark continuously since 1976. In fact, however, Plaintiff's company used the mark from 1976 only up to 1987 when Plaintiff sold the Trademark for a substantial amount of money to a third party. Subsequently, Plaintiff ceased using the Trademark and moved on to another completely unrelated business. Then, in 2018, the third-party buyer of the Trademark fell on hard times after more than 30 years of using the Trademark for his business and decided to take a break with an intent to resume shortly thereafter. By this time, Plaintiff had regained interest in the Trademark and offered to buy it back. However, Plaintiff's offer to reacquire the Trademark was flatly rejected. Nevertheless, Plaintiff began using the Trademark anyways without authorization from the third party to whom he had sold it. Then, Plaintiff falsely represented to the USPTO that he was the sole owner of the Trademark and that he had been using the Trademark continuously since 1976. Based on said

representation, the USPTO issued the Registration.  With the Registration in hand, Plaintiff filed this lawsuit against 241 foreign defendants most of whom are from China or Hong Kong.

On the other hand, Defendant is a manufacturer of a variety of products which it distributes to wholesalers around the world.  Defendant does not sell its products directly to consumers or to retailers.  Instead, Defendant sells its products to wholesalers and other manufacturers.  Defendant does not have any presence in the United States, it does not have any offices, employees, property, or operation within the United States.  With regards to this lawsuit, a listing was published on a website located at [www.alibaba.com](www.alibaba.com) ("Alibaba") identifying a product under the description, "Nickel Brass Old School Pipe Metal Tobacco Proto Pipe".  See *Teran Decl.,* Ex. B.  The listing identified Defendant as a potential seller of the product.  Thus, Plaintiff filed this lawsuit against Defendant solely based on the Alibaba listing.

## II.    PROCEDURAL HISTORY

Plaintiff filed this lawsuit on April 19, 2022, claiming trademark infringement, counterfeiting, false designation of origin, deceptive trade practices, and civil conspiracy, against 241 foreign defendants most of whom are from China or Hong Kong.  See *Complaint,* ECF No. 1.  Concurrent with the Complaint, Plaintiff filed an Ex Parte Application seeking a temporary restraining order which the Court granted.  See *ECF No. 15.*  Essentially, at the start of this case, the Court issued an order for Alibaba and other third parties to produce all documents identifying the amount of products and sales revenue earned by each defendant.  As such, Alibaba immediately provided Plaintiff all records related to the sales of Defendant's products.  Then discovery proceeded to the end including motions to compel filed Plaintiff against Defendant which were denied by the Court.  Ultimately, after a year of litigation, Plaintiff voluntarily dismissed with prejudice all claims against Defendant citing that damages, if any, were minimal.  See *ECF No. 83.*  Make no mistake, Plaintiff did not voluntarily dismiss this case because the parties entered into a settlement agreement.  Instead, Plaintiff voluntarily dismissed this case because he got a case of cold feet and was fearful of facing Defendant at trial.  So

Plaintiff elected to punish Defendant by forcing it to defend against this case. But Plaintiff had no intention of allowing this case to go to trial. This lawsuit was a sham. Then on April 7, 2023, the Court entered a Final Judgment dismissing all claims against Defendant. See *ECF No. 87*. Now, Defendant respectfully submit this Motion for Attorney Fees pursuant 15 U.S.C. §1117(a) and Local Rule 54.3.

## III.    LEGAL STANDARD

The Lanham Act permits an award of attorney's fees to the prevailing party in "exceptional cases". See *15 U.S.C. §1117(a)*. In *Octane Fitness*, the Supreme Court reviewed Section 285 of the Patent Act, which similarly provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." See *35 U.S.C. §285*. In *Octane Fitness*, the Supreme Court held "that an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." See *Octane Fitness, LLC. v. ICON Health & Fitness, Inc*., 572 U.S. 545, 554 (2014).

## IV.    THIS CASE IS EXCEPTIONAL BECAUSE PLAINTIFF'S LITIGATING POSITION WAS WEAK AND OBJECTIVELY UNREASONABLE

The Court has established that Defendant is the prevailing party based on Plaintiff's voluntary dismissal with prejudice. See *Order,* ECF No. 87. Thus, all that is left is to determine whether this case is exceptional. As explained below, this case is exceptional due to the substantive weakness of Plaintiff's claims and litigating position considering the governing law and the facts of the case. The weakness of Plaintiff's litigating position is supported by the fact that there is no evidence Defendant ever used the Trademark within the United States, Plaintiff does not own any rights to the Trademark, and Plaintiff acquired the Registration by committing fraud on the USPTO.

### A.    Defendant Never Used Plaintiff's Trademark in the United States

Throughout this case, Plaintiff repeatedly indicated that the only factual support for his claim was a product listing published on Alibaba showing that "Defendant offered for sale the smoking pipe bearing Plaintiff's PROTO PIPE trademark to the United

States".  See *ECF No. 36-4,* p.4.  See also *ECF No. 78,* p.4.  In support of its allegation, Plaintiff presented the Alibaba product listing which was published by Alibaba, not Defendant.  See *Teran Decl.,* Ex. B.  In fact, there is no evidence that Defendant had any involvement in the publication of said listing.

More important, the product listing does not allow for the direct purchase of the product listed.  Instead, it merely allows to "Start Order" not to "Buy".  See *Teran Decl.,* Ex. B.  In fact, Plaintiff presented a document evidencing that he attempted to purchase the infringing product through the Alibaba listing.  See *Teran Decl.,* Ex. B.  However, page 3 of the Plaintiff's document appears to show that an order was started but could not be completed until the supplier, presumably Defendant, was contacted.  After all, there is no "Payment Amount" identified in the order.  Instead, it states "To be negotiated".  Such is consistent with the rules and procedures of Alibaba.com.  More specifically, Alibaba.com is not a website where products can be purchased directly as in Amazon.com.  Instead, Alibaba.com is merely a directory of various manufacturers. Alibaba.com merely provides contact information of manufacturers and facilitates a transaction only after the seller and buyer have negotiated the terms.  This is expressly described by Alibaba.com as follows:

> "To buy on Alibaba.com, you may follow the steps:
> Step 1. Find products and sellers
> Step 2. Connect with sellers and negotiate with them on product/order details (such as product price, shipping method, shipping cost, etc.)
> Step 3. Pay on Alibaba.com
> Step 4. Ship and receive your goods." See *Teran Decl.,* Ex. C.

Therefore, assuming arguendo that Defendant created the Alibaba product listing, such product listing does not constitute an "offer for sale" as Plaintiff asserts.  After all, an offer for sale is "one which the other party could make into a binding contract by simple acceptance".  See *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1328 (Fed. Cir. 2001).  In this case, at best, the Alibaba product listing can be construed as being a quotation of price which is commonly understood as inviting an offer rather than making one as it omits the quantity to be sold, time and place of delivery, terms of payment, and

other terms.  See *Restatement (Second) of Contracts* §26 (1981).

Accordingly, Plaintiff has been unable to produce any evidence whatsoever that Defendant used his Trademark within the United States in violation of the Lanham Act. Essentially, Plaintiff filed this lawsuit without any evidentiary support for any of its allegations against Defendant.  Such makes this case exceptional.

**B.     Plaintiff Does Not Own The Trademark**

*(1)     Plaintiff abandoned his trademark in 1987*

Plaintiff's Registration expressly states that Plaintiff has used the Trademark continuously since 1976.  See *Teran Decl.,* Ex. A.  However, in deposition, Plaintiff acknowledged that he sold all rights to the Trademark in 1987 without any intent to use it again in the future.  In fact, Plaintiff testified that he sold his business and the Trademark as follows:

> "Q:…  So the sale of the business was in 1987; correct?
> A:  Yes.
> Q:  All right.  And you received $150,000 for the business?
> A:  Over a period of time, yes.
> …
> Q:  So the trademark that you had for Proto Pipe was part of the sale?
> A:  That's correct."  See *Teran Decl*, Ex. H, p.107-108.

Then, in deposition, Plaintiff explained his motives for selling his business and Trademark, as follows:

> "Q:  Why did you sell the business in '87?
> A:  I had another new invention, which I thought was absolutely earthshaking.  It is called -- I now call it Gridbeam.  I used to call it Box Beam structural system. I've written two books on it.  And it is a structural system that allows anybody to dream up and build whatever they want.  It works like a kid's erector set or Legos…  And that's what occupied my intention.  And I thought it will dwarf in sales anything that that pipe would ever do."  See *Teran Decl*, Ex. H, p.82-83.

Thus, Plaintiff sold his business and Trademark in 1987 to start a new business making Gridbeam.  Plaintiff unambiguously acknowledges that he sold his smoking pipe business and his Trademark in 1987 without intent of returning to the smoking pipe

business but, instead, starting a new business selling Gridbeam.  As such, Plaintiff abandoned his Trademark in 1987.  Pursuant 15 U.S.C. §1127, a trademark shall be deemed to be abandoned "[w]hen its **use** has been discontinued with intent not to resume such use… Nonuse for 3 consecutive years shall be prima facie evidence of abandonment."  Thus, Plaintiff relinquished all his rights to the Trademark in 1987 for $150,000.

(2)    *Plaintiff never legally regained rights to the Trademark after 1987*

After selling the Trademark in 1987, Plaintiff did not re-acquire the Trademark under any law or contract.  Instead, Plaintiff wrongly took the Trademark for himself against the will of the true owner.  It is important that Plaintiff sold his smoking pipe business along with the Trademark in 1987 to Mr. Michael Lightrain.  See *Teran Decl*, Ex. H, p.105.  By 2018, when Plaintiff wanted to return to the smoking pipe business, Plaintiff and Mr. Lightrain were no longer on good terms.  Plaintiff testified as follows:

> "Q:  Did you ever have a falling out with Michael Lightrain?
> A:  Yes.  Near the end, when he was shutting down and not able to fill orders, I had come up with a new pipe design, and I said, 'Let's be partners.'  And he said, 'I would rather compete against you.'
> Q:  And what year was this?
> A:  That would have been about 2017, 2018, somewhere in there.
> Q:  Okay.
> A:  And he was losing it fast, but he --
> Q:  When you say losing it, what do you mean by losing it?
> A:  He was losing market share.· His employees had all left.  And it was just him in this big building.  He was trying to make pipes one at a time.  And just couldn't keep up with it.  And, again, he hadn't paid his rent for several years, and the landlord evicted him.  So he packed up the manufacturing equipment and put it in storage.  And I brought in the equipment that I had put together and was operating out of my living room.  And I moved back into this big building.
> …
> Q:  Did he sell the patent or the trademark back to you when you restarted the pipe business?
> A:  No.
> Q:  I think your earlier testimony was that he indicated to you that he would rather compete with you?
> A:  That was his initial -- that is what he had said, yeah.
> ...
> Q:  What happened between 2015 and 2018?

A: I had a series of conversations with [Mr. Lightrain] and tried to convince him that I had a better Proto Pipe and that we should join forces. And he said he had a plan that didn't involve me. And, of course, he didn't have a plan. His only plan was just to go under. He lied to me.

…

Q: You said that Mr. Lightrain had told you that he had plans that didn't include you; is that right?

A: Yes.

Q: Do you know if those plans of his included the Proto Pipe?

A: His plan was to probably sink the company. I have no idea what was going through the man's head, but I think he has a case of Alzheimer's. He is, I believe, 78 or might even be 80 now.

Q: Did he ever indicate to you that he intended to get back into the pipe business and start selling Proto Pipes again?

A: I think he feigned that he would, but he did not and he cannot. He is too incapable. Nobody trusts him. The ex-employees all left on a bad note with him. He was really destroying the brand. And that's why I had to step in.

…

Q: All right. So did you say that Mr. Lightrain had claimed to you that he intended to go back into the pipe business and sell Proto Pipes again?

A: He -- yeah, I would say he thought that he would, but everybody knew that he wouldn't. He is a liar.

Q: When was the last time he made this representation to you?

A: Maybe when I saw him six months ago, but this is by a broken man who I knew -- he couldn't fight his way out of a wet paper bag.· He had no credibility anymore. He had destroyed -- he had invested in so many companies. Everything he touched went to hell.

…

Q: What makes you believe that you got the Proto Pipe name back?

A: Because I then owned the federal registration. I also took that federal registration to the County where I got a fictitious business name. I took that to the Bank of Willits, showed them that. And Michael Lightrain had a checking account there, and I showed the president of the bank my legal federal trademark. And they gave me a checking account and kicked him out of the bank, kicked Michael out of the bank, because I owned the federal registration of the name Proto Pipe. Our lawyers went over that very carefully. It took them two days, and they decided I am the only owner of that name.

…

Q: Did you pay any money to Mr. Lightrain to be able to reuse the name Proto Pipe?

A: No, I did not." See *Teran Decl*, Ex. H, p.116-126.

Therefore, Plaintiff acknowledges that he sold his smoking pipe business and the Trademark to Mr. Lightrain in 1987 for $150,000 without any intention of returning to the smoking pipe business. In fact, Plaintiff's intent was to abandon his involvement in the smoking pipe business and build another business selling Gridbeams. But then, after Plaintiff's Gridbeam business failed and after Mr. Lightrain's smoking pipe business fell in hard times, Plaintiff swooped in maliciously and took Mr. Lightrain's Trademark against Mr. Lightrain's will. That which cannot go unnoticed is that Mr. Lightrain paid Plaintiff a substantial amount of money for the smoking pipe business and Trademark. But, then Plaintiff just took the Trademark away from Mr. Lightrain without paying Mr. Lightrain anything.

Essentially, at all relevant times in this lawsuit, Plaintiff did not have any rights to the Trademark at all whatsoever. Instead, Plaintiff falsely represented to the USPTO and to this Court that he is the owner of the Trademark because he used it continuously in commerce since 1976. Such is a blatant and egregious lie. Its no wonder that Plaintiff voluntarily dismissed this case, he knows this lawsuit was a sham and he was afraid to face Mr. Lightrain's testimony at trial. Such makes this case exceptional.

### C. The Registration Is Invalid Due to Plaintiff's Fraud on the USPTO

Plaintiff's Registration identifies the registrant to be "Phillip Jergenson (California Sole Proprietorship), DBA Mendo Mountain Manufacturing". See *Teran Decl*, Ex. A. Therefore, the Registration was not issued to Plaintiff as an individual but to Plaintiff as a sole proprietor that does business as "Mendo Mountain Manufacturing". However, Plaintiff acknowledges that he has never used the Trademark while he was doing business as "Mendo Mountain Manufacturing". In fact, in deposition, Plaintiff testified as follows:

> "Q: Okay. When did you establish Mendo Mountain Manufacturing?
> A: In I think it would have been January of 2015.
> Q: And is Mendo Mountain Manufacturing still in existence?
> A: No.
> Q: What happened to Mendo Mountain Manufacturing?
> A: When I got the brand Proto Pipe back, I dissolved Mendo Mountain Manufacturing. I had no use for it anymore.

…

Q: Did you, Phillip Jergenson, doing business as Mendo Mountain Manufacturing, use the trademark Proto Pipe since July 12, 1976, to the present?

A: Well, when I had Mendo Mountain, which was only about three years, I did not use the name Proto Pipe. I used the name Mendo Pipe.

…

Q: All right. So let's step back. Did you use -- let me ask it again. Did you use the trademark Proto Pipe as yourself, Phillip Jergenson, doing business as Mendo Mountain Manufacturing since 1976?

A: No." See *Teran Decl*, Ex. H, p. 183-186.

Thus, Plaintiff was issued the Registration based on his false representation that his proprietorship "Mendo Mountain Manufacturing" used the Trademark since 1976. See *Teran Decl*, Ex. A. However, now Plaintiff acknowledges that his proprietorship never used the Trademark at all. In fact, Plaintiff acknowledges that he set up Mendo Mountain Manufacturing in 2015 and dissolved it when he received the Registration in 2019. Essentially, the registrant of the Registration, Mendo Mountain Manufacturing, no longer exists. Accordingly, Plaintiff lacks standing to bring this lawsuit since the registrant of the Registration did not exist when this suit was filed.

Even more, as discussed above, Plaintiff, as an individual, also does not have any enforceable rights to the Trademark because such rights, if any, belong to Mr, Lightrain. The Trademark was never re-assigned to Plaintiff by Mr. Lightrain. Nevertheless, Plaintiff is not the one that manufactures or sells the smoking pipes. In fact, the smoking pipes are currently manufactured, marketed, and sold by Proto Pipe, LLC. See *Teran Decl*, Ex. H, p.128. Even more, prior to his sale of the smoking pipe business to Mr. Lightrain, the smoking pipes were manufactured, marketed, and sold by Proto Pipe, Inc. See *Teran Decl*, Ex. H, p.182-183. Thus, contrary to the Registration, the Trademark was used by Proto Pipe, Inc. from 1976 to 1987, then by Mr. Lightrain from 1987 to 2018, and then by Proto Pipe LLC from 2018 to the present. Plaintiff, as an individual or as a sole proprietor doing business as Mendo Mountain Manufacturing, never used the Trademark in connection with the smoking pipes as Plaintiff represented to the USPTO. Accordingly, the Registration is invalid due to Plaintiff's false representations to the USPTO.

11

Furthermore, the Registration was issued under International Class 34 based on Plaintiff's false representation to the USPTO that the smoking pipe is for use with tobacco. After all, International Class 34 is exclusively reserved for products related to tobacco smoking. See *Nice Agreement*, Eleventh Edition, version 2022 (NCL 11-2022). However, Plaintiff designed the smoking pipe to smoke marijuana. See *Teran Decl.,* Ex. H, p.152-153. Even more, Plaintiff knew that the smoking pipe was used by consumers primarily to smoke marijuana. See *Teran Decl.,* Ex. H, p.101. After all, Plaintiff's smoking pipe is known as the "Perfect Pot Pipe" [See *Teran Decl.*, Ex. D], "one of the best weed smoking pipes on the market" [See *Teran Decl.*, Ex. E], and "the godfather of weed pipes" [See *Teran Decl.*, Ex. F].

Based on the foregoing, Plaintiff falsely represented that he or his sole proprietorship used the Trademark since 1976 and that the smoking pipes were traditional tobacco pipes. Such false representations were made intentionally to dupe the USPTO into issuing Plaintiff the Registration so that Plaintiff could mastermind an audacious coup d'etat of the Trademark from Mr. Lightrain. After all, Plaintiff submitted his trademark application after Mr. Lightrain rejected Plaintiff's offer to re-acquire the Trademark. As such, the Registration is invalid due to Plaintiff's fraud on the USPTO making this case exceptional.

## V. THIS CASE IS EXCEPTIONAL BECAUSE OF THE UNREASONABLE MANNER IN WHICH THE CASE WAS LITIGATED BY PLAINTIFF

As explained below, this case is exceptional because Plaintiff litigated this case in an unreasonable manner since he knew from the very start that the damages, if any, were minuscule. Further, the evidence shows that despite the low damages, Plaintiff continued to pursue this case unreasonably to gain access to Defendant's financial records outside the United States.

### A. Plaintiff Litigated This Case Knowing That Damages Were Low, But Then Dismissed This Case Because Damages Were Low

Plaintiff's primary reason for seeking voluntary dismissal was that the expense of the one and only deposition that Plaintiff wished to take "alone outweighs any monetary

remedy Plaintiff could expect to receive should he prevail in this case." See *Motion for Dismissal,* ECF No. 83, p.2. In fact, the legal fees and costs incurred by the Parties far outweigh any monetary remedy that could come from this case. But, Plaintiff knew that this was a reality soon after it filed this lawsuit and yet continued to drag Defendant through this costly litigation.

In fact, this entire case was based on the following assertion:

> "Inhale offers for sale and sells counterfeit, infringing smoking pipes to consumers through its Alibaba.com storefront using Plaintiff's PROTO PIPE trademark." See *ECF No. 36-4,* p.4 (under heading "Inhale's Unlawful Activities").

Thus, this entire case was based on Defendant's alleged sales and offers for sale through Alibaba.com. But now, after almost a year of litigation, Plaintiff finally acknowledges that the damages are so low that the expense of one deposition "outweighs any monetary remedy". See *Motion for Dismissal,* ECF No. 83. The problem is that Plaintiff has known of this reality since the beginning of this lawsuit. Despite knowing that the damages are miniscule, if any, Plaintiff continued to drag Defendant through this costly litigation unfairly. In fact, at the start of this case, this Court issued a Temporary Restraining Order (ECF No. 16) ordering as follows:

> "…any third party…who is providing services for any of the Defendants…such as Alibaba…shall…provide to Plaintiff expedited discovery…sufficient to determine…(a) identities and locations of Defendants…; (b) the nature of Defendant's operations and all associated sales…and financial information; and (c) any financial accounts owned or controlled by Defendnats…" See *TRO, ECF No. 16,* ¶4.

Thus, at the start of this case, Plaintiff attained records related to all of Defendant's sales and offers for sale through Alibaba. Essentially, throughout this litigation, Plaintiff had all the information it needed to determine that the cost of a single deposition "outweighs any monetary remedy". Despite knowing this reality, Plaintiff dragged Defendant through this costly litigation month after month for almost a year. Such disingenuous tactic amounts to unfair treatment of Defendant and should not be condoned by this Court.

13

The truth is that Plaintiff knew from the start of the case that damages from Defendant's actions were miniscule, if any. But Plaintiff made a calculated decision to continue litigating the case to extract an unreasonable nuisance settlement from Defendant; to punish Defendant by forcing it to spend substantial amount of money and resources litigating this case; and/or to wrongly acquire as much information about Defendant's business as possible, including customer lists and data related to Defendant's sales.

But when it became apparent that Mr. Lightrain would testify at trial regarding Plaintiff's lack of ownership interest in the Trademark, the risk of litigating this case became too high for Plaintiff. Thus, Plaintiff suddenly got a case of cold feet and voluntarily dismissed this case to avoid facing Defendant and Mr. Lightrain at trial. Now, it would be patently unjust to allow Plaintiff to simply walk away after all the harm it has caused to Defendant. Such makes this case exceptional.

B.      **Plaintiff Litigated This Case To Wrongly Attain Defendant's Worldwide Sales Data**

Despite knowing that damages were low, Plaintiff continued to litigate this case to gain access to Defendant's information, including customer lists, for its sales outside the United States. When Defendant refused to provide such information, Plaintiff proceeded with a motion to compel in which he asserted as follows:

> "In the present case, Plaintiff's request for Defendant's U.S. and non-U.S. sales information solely with regard to Smoking Pipe is relevant to the following issues: (a) whether Defendant infringes Plaintiff's federally registered trademark PROTO PIPE; (b) whether Defendant made any sales of Smoking Pipe to the U.S.; (c) a determination of the reasonable royalty rate." See *Motion to Compel,* ECF No. 78, p.5.

Getting information on Defendant's sales outside the United States is the Holy Grail for Plaintiff. After all, Defendant is a foreign entity that sells its products throughout the world, especially in Asia. On the other hand, Plaintiff is an individual resident of California whose business is mostly limited to the West coast of the United States. Plaintiff can only dream of getting Defendant's sales information. Such would provide Plaintiff an exceptional competitive advantage. But, since the Lanham Act only

applies to infringement in the United States, this Court denied Plaintiff's motion to compel holding as follows:

> "The court agrees that information about non−U.S. sales is not sufficiently relevant to warrant discovery. Damages will not be based on a royalty derived from non−U.S. sales …" See *Order on Motion to Compel,* ECF No. 87.

The Court's order on Plaintiff's motion to compel was entered on March 27, 2023. Then Plaintiff filed its Motion for Voluntary Dismissal on March 29, 2023, a mere two (2) days later. Thus, Plaintiff finally dismissed this case immediately after it realized that it would not be able to attain Defendant's records for non-US sales. After this, and after knowing that Mr. Lightrain was ready and willing to testify at trial as to Plaintiff's illegal appropriation of the Trademark, Plaintiff's case was crumbling. Thus, Plaintiff elected to voluntarily dismiss this case rather than face Defendant at trial. Such makes this case exceptional.

## VI.     THE ATTORNEYS' FEES REQUESTED ARE REASONABLE

Attorney's fee awards ordinarily are calculated using the Lodestar method. See *Intel Corp. v. Terabyte Int'l,* 6 F.3d 614, 622 (9th Cir. 1993). "In setting a reasonable attorneys' fee, the district court should make specific findings as to the rate and hour it has determined to be reasonable." See *Gracie v. Gracie,* 217 F.3d 1060, 1070 (9th Cir. 2000) (quoting *Frank Music Corp. v. Metro-Goldwyn Mayer, Inc.,* 886 F.2d 1545, 1557 (9th Cir. 1989)).

In the present case, to establish attorney hours and rates, Defendant submits the Joint Statement pursuant Local Rule 54.3(e). See *Joint Statement*. The Joint Statement includes a summary of fees showing that Defendant spent 233.3 attorney hours at rates ranging from $400 to $450 per hour. Thus, the total amount of attorneys' fees spent by Defendant in this case is $104,120. See *Joint Statement,* ¶1 and Ex. A-B.

The reasonableness of the hourly rates of Defendant's counsel is supported by the AIPLA Report of the Economic Survey ("AIPLA Report") which states that the mean average hourly billing rate for an attorney practicing intellectual property law in San Francisco is $589 and in a metropolitan area in the west coast other than San Francisco is

$399.  See *Teran Decl*., Ex. G.  Given that Defendant's counsel practices intellectual property law in Los Angeles (not much different from San Francisco), the hourly rate of $450 is reasonable.  Furthermore, given that Defendant's counsel has over 15 years of experience litigating Intellectual Property cases, holds an engineering degree and an MBA in addition to a law degree, and is licensed to practice before the United States Patent and Trademark Office ("USPTO") as a patent attorney, his hourly rate of $450 is reasonable.  See Teran Decl., ¶10-18.

In addition, the reasonableness of Defendant's attorney's fees is supported by the AIPLA Report which states that the median litigation costs of a trademark infringement lawsuit with less than $1 Million at risk is $150,000 inclusive of discovery, and motions, but not inclusive of pre- and post-trial or appeal.  See *Teran Decl.,* Ex. G.  Thus, Defendant's attorney's fees are reasonable considering that the case was voluntarily dismissed at the end of discovery.

As such, Defendant's attorney's fee of $104,120 is reasonable.

## VII.  **CONCLUSION**

Based on the foregoing, Defendant respectfully requests this Court to award Defendant's attorney's fees of $104,120 under the Lanham Act (15 U.S.C. §1117(a)) and the Court's authority.


DATED:  June 30, 2023

By:_____

Louis F. Teran (Admitted *Pro Hac Vice)*
Email: lteran@slclg.com
California Bar No. 249494
SLC Law Group
1055 E. Colorado Blvd., Suite 500
Pasadena, CA 91106
Phone:  818-484-3217 x200

ATTORNEY FOR
INHALE INTERNATIONAL LIMITED